The first case on calendar for argument is Speck v. Kijakazi. Counsel for appellant, please proceed. Thank you. Madam Chief Judge, members of the panel. Not the Chief Judge. I don't want Judge McGee to think I'm usurping her. Presiding Judge. Presiding Judge. Thank you. And Mr. Staples, my name is Jim O'Brien. I'm here on behalf of Teresa Speck. And we think that the briefing sets up what we see as a fundamental tension between your 405 authority to review an adverse decision by the ALJ and the ALJ's use of 1520 sub C in terms of supportability and consistency. There is clearly a medical opinion which is found at the certified record at 1176 and 1177. It's a two-page extensive medical opinion by her treating physician, Dr. Schnobb Ucker. And we think 1520 sub C by the terms of its own language requires that ALJs explain a medical opinion. We understand that the principal factors are supportability and consistency, but that nevertheless a separate duty of the administrative law judge is to make sure that they understand how they got to the decision regarding acceptance or rejection of a medical opinion. And when, as here, there's no detail to supportability and consistency. If I remember correctly, Dr. Schnobb Ucker, on the one hand, talked about your client's enduring back pain, but on the other hand, said that she was functioning rather well. So why couldn't the ALJ rely on the latter? Excuse me, Your Honor. I want to give you the actual citation in Garrison v. Colvin, 759 Fed 3995 at page 1017. The circuit court there said, doing well for purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity. So one might imply that the ALJ assumed from medical records of her doing well on occasion that there was a relationship between that and the ability to work, the ability to work. But it would be, again, without explanation from the ALJ, because that's not in the decision. We are left to speculate, well, what should we take from this finding or that finding, because we know as a matter of law it isn't sufficient to establish work limitations or functional ability. If the treating doctor gives inconsistent findings, then cannot the ALJ say, I don't attach any credibility to these findings, because they're inconsistent, and so I'm just going to disregard them? Absolutely, Your Honor, and the commissioner makes the argument at pages 715 and 769 that we have a claimant who is community, who is able to ambulate throughout the community. But it's very important here that when you actually look at the records, it's a very qualified observation by Dr. Schnabel who said intermittently she is able to do community ambulation. You will find that in the certified record at page 715 and 769. Counsel, the difficulty for me with this case is I had, there was some lack of specificity in weighing the opinions. What part of the ALJ decision should I look to to see how he weighed the various medical opinions? That's a very interesting question. When you look at the decision, you'll find by referencing Woods versus Kozacki on the footnote 4 on which the social security relies, I'm not talking about the case, I'm talking about go through the ALJ decision for me and tell me from your perspective, where did the ALJ in that decision weigh the respective medical opinion? By finding Dr. Schnabel's observation of community ambulation instead of what the medical record actually shows, which is intermittent community ambulation. How much weight did he give to that opinion? Enough to say that it was unpersuasive. And that's, I believe, at page 22 to 23 of the certified record. And so in that body of discussion, he identifies page 715 and page 769 as the basis for finding the opinion is inconsistent. We also note for the record that there are over, I think it's 19 exhibits in the file, complete with medical records, complete with observations, and he had that opportunity to explain, well, this record or that record defeats the observation of the medical opinion that Dr. Schnabel, after nine and a half years, had developed. Put simply, we think that there is no substantial evidence in the decision which articulates supportability and consistency factors for purposes of rejecting Dr. Schnabel's opinion. Counsel, let me ask you this. Is it your view that the hypothetical that was opposed to the VE incorporated all of the functional limitations that Ms. Speck demonstrated? No, because none of the questions said how does the intermittent ability to walk in the community impact workability? No one asked how is it that if you are so severely in pain, varying throughout the course of a week or a month, that that person is capable of making it through a probationary period of employment, much less permanent employment? Those questions were never asked, that evidence was never exacted, and it relates back to this deficient explanation of supportability and accountability which is demanded by the regulation. I have one final question. Do you use specific medical evidence in the record to contradict Ms. Speck's symptom testimony? No. I'll stand corrected with that. Teresa had two medical conditions which were foremost in the opinion of the ALJ. One was the physical problems she had, and the other was the mental problems. There is significant information on the mental problems in that evaluation. I'm talking about her specific symptom testimony. No. It's been disbelieved, and again because of the medical opinion explanation or lack thereof, her statements about her own situation are disbelieved as being exaggerated or at some point in the opinion the ALJ actually admits that yes, there are some records that say she has severe pain, but he was unpersuaded beyond saying that, except to say she was not fully credible for purposes of description of her symptoms. I have one question about your argument about the frequency of her treatment, medical visits. The government says you are basing your number of medical visits that Speck requires based on an average number of medical visits over a certain past period of time. Is that correct? Yes. What types of visits were you including in that average? All her providers? There are significant medical records which show she is receiving treatment at least every two weeks, if not every week. Are they all specified, prescribed, or recommended treatment visits for a particular course? Yes, and it's principally related to anxiety, not related to depression. What evidence in the record is that the visits were prescribed or recommended at a certain frequency or duration? I'm sorry, I couldn't hear that. Where in the record does it show that a provider recommended a particular course of treatment that requires this frequency of visits? I would say by inference, because there is no special medical or mental health opinion saying she needs to be here once a week or once every two weeks. Okay, and is there anything in the record showing that the timing of those visits would necessarily interfere with the work day or work week? That would be true. There is an amount of time that has to go, but I don't know the example of how long each does. I am making the assumption it's an hour-long treatment. All right, thank you, counsel. You've exceeded your time, but we will give you one minute for rebuttal. Good morning. May it please the Court, Jeff Staples here for the Commissioner, who asks that you affirm the District Court's judgment because substantial evidence supports the ALJ's findings of fact. So let me pick up on the last point that Judge Sung was mentioning. Thank you, Your Honor. As I understand it, the evidence, Ms. Speck provided evidence that she scheduled in 2019 two or more monthly visits, and in 2020, basically four monthly visits over a period of many, many months. Why wasn't that telling evidence that she couldn't qualify for the jobs that the ALJ thought she could? Because there's no evidence in the record that, well, there's two absences of evidence. As Judge Sung was pointing out, there's no evidence that she actually needed every single one of those appointments, as opposed to, you know, some people may have a preference for that. They may have a preference for seeing their doctor more frequently. There's also no evidence that those appointments needed to be scheduled during hours that she would be working. There's no evidence of when she would be working. So really, you know, as my colleague pointed out... Never try to get an appointment with a doctor in evening hours. If you have, you're certainly an unusual fellow. Right. And, you know, I mean, as he's arguing, you'd be making an inference that, you know, A, she needed to schedule these appointments during work hours, and B, that they would take up so much time that she'd be unable to work. But my point is, isn't it sort of a natural inference that it would have to be during working hours? It could be an inference that you could draw, I think. But the question for this court is whether the ALJ was reasonable in finding that that would not interfere. And this court really has quite frequently, also lately, decided that this kind of analysis is not appropriate for saying what the ALJ needs to include in the RFC. You know, our brief cites this court's Johnson case. There's also Goodman. And then there are a few other recent cases that have come out since the briefing in which this court has... Well, I'm looking, for example, at this court's decision. It was a memorandum disposition, but in Boursier, where the court stated, on remand, the ALJ should consider, for example, the need to schedule all appointments during the work week hours. Or work day, the need to miss an entire work day for each appointment, and whether the need for this number of appointments is ongoing. So there, this court was saying, we just can't rely on an empty record. The ALJ has to take a look at those since the plaintiff has come forward with evidence that she has, in fact, had repeated frequent appointments. Weekly or biweekly appointments over a period now of several years. So the gist of that opinion, it seems to me, is that at that point, the ALJ has to look into it. So my recollection of Boursier is that there was some vocational evidence. There was testimony provided by the vocational expert in that case to the effect that these, you know, these treatments would be, you know, interfering with work. There's no such evidence here. And, you know, there's, in the cases where the court has gone against the argument that treatment needs to be accounted for, those are the cases like this one, where that's just not brought up anywhere in the record. That's not brought up by a doctor. That's not brought up by the claimant's representative at the hearing. That's not brought up by the vocational expert. So you'd really be going on pure inference that this is something that the ALJ needed to account for. And as I said, the question, you know, isn't whether it might be reasonable to draw that inference. The question is whether the ALJ's decision as written is reasonable. So absent any opinion that she needed this many appointments over this period of time, absent any vocational testimony that these appointments would interfere with her job, the ALJ is not required to... On the latter point you just mentioned, there was testimony from the vocational expert that if someone in her position, quote, required breaks of more than 10 minutes in excess of the two 15-minute breaks normally allowed during a workship, and or the 30 to 60-minute breaks normally allowed a mid-shift, and or the person were to miss more than two days of work in a typical work month on at least an occasional basis, such an individual would not be capable of competitive employment, close quote. So doesn't that at least provide evidence on the second of the two questions? The two absences you were just citing. No, Your Honor, because there is no, there's nothing to suggest that she would either miss an entire work day, you know, that was one of the parts of the question to the vocational expert. And there's also no evidence that, you know, I don't think that breaks, you know, additional breaks is really quite getting at medical appointments. I think usually when you think of breaks, you think of, you know, I'm having, you know, pain, I need to come away from my computer for a minute. You know, there's, without any evidence to suggest that those appointments would, you know, be a part of what the vocational expert is talking about, I think you're making some inferential leaps to put that vocational expert testimony together with this argument that Speck is making. And I think that's, you know, as I've been saying, while that leap may be reasonable and while someone, you know, could certainly make that, I don't think that makes the ALJ's decision irrational to say that, you know, that this whole day off of work is not what's coming up on a medical appointment. Absent some kind of link in the record, which we just don't have, you know, she's relying on assumptions and inferences, and those may be reasonable, but it doesn't show that the ALJ was, you know, beyond the pale of reasonableness herself in making those findings. Counsel, I wanted to turn to my prior questions to oppose and counsel about how the ALJ weighed the medical opinions. And I'm particularly concerned about the opinion of her treating physician for 10 years, Dr. Schwabacher. Where in the ALJ opinion did it grapple with the findings of Dr. Schwabacher in terms of her physical limitations? Thank you, Your Honor. That's at the bottom of page 22 all the way to about halfway down page 23. And the ALJ discusses the letter that Dr. Schwabacher wrote about Speck's course of treatment, you know, medications that she'd been prescribed, surgeries that she'd had, treatment visits that she'd undergone. But the ALJ first pointed out that this is really just a, you know, the last paragraph of Dr. Schwabacher's opinion in which he said she can't work, she can't carry out any tasks. Setting aside that part, he talked about her ability to function was remarkably limited, and he tied that to the lumbar fusion surgeries, the nerve root involvement, the polyarticular pain, and migraine headaches. So where did the ALJ deal with those particular findings by her treating physician? So, you know, right after that sentence where the ALJ said that this is essentially a statement that the claimant can't work, the ALJ goes into some detail after that explaining why Dr. Schwabacher's conclusion about her treatment was not consistent with the record. And the ALJ... How not consistent with the record? How are they not consistent with the record? Because you're looking at his own medical records. So how can the ALJ support the determination that it's not consistent with the record when you're looking at the doctor's records? I'm a little confused by that. So, you know, as Judge Rakoff was pointing out, on the one hand, you have Dr. Schwabacher, and on the other hand, you have Dr. Schwabacher. So you have Dr. Schwabacher's conclusion in this letter that she's, you know, so severely functionally limited from her pain that she can't do any work at all. Then on the other hand, you have in Dr. Schwabacher's treatment notes, she's actually doing quite well. You know, she's experiencing good benefit from her medication. Does the ALJ say that? Does the ALJ say that Dr. Schwabacher's notes on each one of these is consistent with his medical records? Yes, Your Honor. The ALJ says, I'm in the middle of the paragraph on page 23, quote, the doctor's examinations are not consistent with his opinion. So, and then the ALJ goes through and gives a few examples of that. And, you know, the community distance ambulator, when he's saying she can't do any walking in the opinion, but then throughout his treatment records, you have her, you know, walking just fine. You know, she's independent with personal care. She maintains her household. She has full motor strength. These kind of findings don't line up with the opinion that she's unable to do any tasks whatsoever. Well, you're saying that, but the ALJ didn't say that. That's the problem. The ALJ did not articulate any of those in his discussion. I mean, respectfully, Your Honor, I think it's, I mean, the ALJ went through and... Where? Okay, so the next sentence... He said on page 23, he said that. On page 23, the sentence after the one that I just read, the ALJ says, quote, for instance, during an examination conducted... Where did the ALJ say she's able to ambulate? Yeah, that, so it says the claimant complained of pain, but the doctor noted she was able to maintain household activities and her health was otherwise good. What page are you on? I'm on page 23. That large paragraph on page 23 is the one in which the ALJ kind of contrasts the treatment records with... But that's not the paragraph where he's talking about the doctors. Yes, Your Honor, that's the same paragraph that ends with... Which paragraph are you on, the first full paragraph, second full paragraph? No, the, so... The paragraph continuing from page 22.  Okay, so what sentence is that? So, after the sentence, the doctor's examinations are not consistent with his opinion. There's several sentences after that, and I think those are a fair contrast between... None of those sentences say she's able to ambulate. You represented that it says she's able to ambulate, but none of those sentences say that. And I apologize for that, Your Honor. I should not have put those words in the ALJ's mouth. I think what this paragraph is doing is kind of summarizing what the record showed. And earlier in the decision, the ALJ had gone through and kind of talked about Dr. Schabacher, noting that she was a community distance ambulator, and I can look in the decision and... I have seen that, but the point is that in this paragraph is where he's supposed to tell us how he weighs the medical test, how the medical testimony is weighed, and why. And generally, we get a pretty fulsome discussion as to why the medical testimony was discounted or credited and the basis for that, and in my view, this is a little sparse in that arena. Yeah, I think that's fair. The ALJ did not marshal every single piece of evidence throughout that decision and bring it, you know, repeat it in the discussion of Dr. Schabacher's opinion. But I think you do, you know, you need to do two things. You need to look at this discussion and see, I think the ALJ is pretty fairly going through and explaining why the ALJ found Dr. Schabacher's opinion was not persuasive. It's not supported by his treatment records and it's not consistent with other evidence. Then you have to look at the decision as a whole and see that this is, you know, the ALJ says, for instance, this is not, I don't think this is meant as an exhaustive list of what the ALJ was considering, because if you look at the rest of the decision, the ALJ kind of did go through in a bit more detail and explain what were, especially Dr. Schabacher's treatment notes. You know, the ALJ made numerous other references to that, and I think that's where, you know, you can pull that, you can pull that together and see what the ALJ was thinking. I don't think it's an unreasonable leap to put those together and see what the ALJ was doing. When the ALJ explained in that paragraph that the opinion wasn't fully consistent with Dr. Schabacher's treatment notes and other treatment notes in the record, I think you can then look at the decision as a whole and see that the ALJ pretty fairly did characterize the rest of that evidence. And the ALJ was free to find that opinion unpersuasive. All right, thank you, counsel. You've exceeded your time. If there are no questions. Thank you very much. Thank you. I'll be very, very brief. I think what we heard in the response today is that there's a finding of, generally speaking, no actual decision. She doesn't mention either one of those factors. And in the seminal case of Woods v. Kajazaki, there's a footnote at footnote 4 that says, supportability and consistency are terms of art that require precision. That is the springboard for this Court to be able to say, we don't have enough evidence to support that decision. We don't have enough of an explanation for the conclusion that Dr. Schabacher's opinion is unsupported or insufficiently supported or inconsistent. And that's why you can look at that record and you don't have any explanation for the major factors, terms of art, that should be detailed. So this Court has the opportunity to then review those statements against those factors and make a decision based on the record. Was the Administrative Law Judge Michael Kilroy correct? I'm sorry, I was. I was thinking it was. I was saying she and I was like, you have the wrong person. I apologize, Your Honor. Okay, thank you. Thank you to both counsel for your helpful arguments.
judges: RAWLINSON, SUNG, Rakoff